IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


TABITHA N. MULLINS,
      Plaintiff,

                                Case No. C2-05-1002
  vs.                            Judge Edmund A. Sargus, Jr.
                                Magistrate Judge Mark R. Abel


U.S. BANK, N.A.,
      et al.,

      Defendants.


## OPINION AND ORDER


In this race and pregnancy discrimination action, Defendants, U.S. Bank, N.A. and Kenneth Kessler, move the Court for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff has invoked the Court's federal-question jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), and supplemental jurisdiction over her state-law claims of discrimination and intentional infliction of emotional distress.[1]  Plaintiff, Tabitha N. Mullins, opposes the Motion, arguing that genuine issues of material fact preclude entry of summary judgment.  For the reasons that follow, Defendants' Motion is granted as to the federal claims.  The Court declines to exercise supplemental jurisdiction as to the state law claims.  Defendants' Motion to Strike is granted.

## I.

In November of 2003, Plaintiff, Tabitha N. Mullins, began employment as an In-Store Banker at the Eastland Kroger branch of U.S. Bank in Columbus, Ohio.  Plaintiff is an African-American

---

[1]      Plaintiff has not alleged diversity jurisdiction.

and, at the time of her employment with U.S. Bank, resided in Canal Winchester, Ohio.  During her employment with U.S. Bank, Plaintiff's supervisor was Kenneth Kessler, who held the position of branch manager at the Eastland Kroger location.

In the Spring of 2004, Plaintiff learned that she was pregnant.  Kessler was aware that Plaintiff was pregnant.  Both Kessler and the Plaintiff agree that he expressed his excitement that she was expecting a baby.  Kessler instructed Plaintiff to be cautious, and not to lift heavy items, including coins for her teller drawer.  Plaintiff testified in her deposition that the circumstances of her job remained the same and no one treated her differently until several months into her pregnancy.

Plaintiff also testified that her supervisor, Mr. Kessler, began treating her differently beginning in approximately August.  She testified that Kessler became easily frustrated with her, and overly dismissive when she would ask for direction or assistance.  On one occasion, Plaintiff alleges that Kessler was so agitated with her regarding her failure to timely print a balance sheet at then end of a workday that he threw a keyboard, striking her arm, and then knocking over items from the bank ledge into the Kroger store.

Plaintiff's co-worker, Melissa Evans, who is no longer employed by U.S. Bank, testified that Kessler treated Plaintiff differently than he treated the rest of the employees.  Evans testified that she did not "want to say that [Kessler] was a racist, but you could tell that he treated her differently than he treated the rest of us." (Evans Dep., at 14.)  Evans speculated that "[i]t wasn't because of her age, because I was younger than her.  There were people that were older than her.  We were female, so it's not because we were female.  He just treated her differently." (Id.)

On the morning of September 15, 2004, prior to working, Plaintiff began to have cramps and

spotting associated with her nineteen-week pregnancy. Although she had vacation and sick leave available, Plaintiff reported to work and indicated to Kessler that she was having these physical difficulties. Plaintiff called her physician, who told her to drink water for one hour to avoid dehydration, which the doctor indicated could cause the physical pain. The doctor instructed Plaintiff, however, that if the cramping did not subside within one hour, she should report to the emergency room.

Plaintiff testified that Kessler tacitly required her to stay at work until after 5:30 p.m despite being aware of her condition. Plaintiff asserts that she told Kessler that she was in pain, and, when the pain had not subsided, that she needed to go to the emergency room. According to Plaintiff's deposition testimony, Kessler responded by saying that she should take her 30-minute lunch, and told her to assist customers. He also told her that he needed her to work the next day.[2] Kessler did not refuse a request by the Plaintiff to seek medical treatment.

By late in the day, Plaintiff's pain had increased to the point that she need to lie on the floor in the back by the vault. According to Plaintiff, when Kessler discovered her lying on the floor, he

---

[2]      Specifically, Plaintiff testified as follows: "I went back to Mr. Kessler and let him know I was still cramping and it was still hurting. And he told me to go to lunch break. So I left and went to lunch break. When I got back, he asked me how I as doing. And I expressed to him the same. I was still hurting and everything. And he told me, 'Well, go back to work. I need you to work tomorrow.'" (Pl's Dep., at p. 119) Plaintiff later testified:

> Q.      Did you tell Mr. Kessler that you need to leave to go the emergency room?
> A.      Yes. And he said, "Go to lunch." That's what he told me. That's the time I took for lunch.

(Pl's Dep., at p. 124.)

Plaintiff's affidavit, executed after her deposition, states that "[w]hen I asked whether I could leave at lunch time, he said to go to lunch and come back because he needed me to work the next day. It seemed from the way he said it that he believed if I left I would not be there the next day either." (Pl's Aff., ¶ 26.)

-3-

told her to leave and "to do whatever it is" she was going to do. (Pl's Depo., at p. 127.)[3] Plaintiff's husband then picked her up at work, and took her to the emergency room. In his deposition testimony, Kessler disputes Plaintiff's version of these facts, and maintains that he consistently encouraged Plaintiff to seek medical attention.

Plaintiff was admitted to Mount Carmel East Hospital, where she was hospitalized for four days due to arrested premature labor. Due to the complications in her pregnancy, Plaintiff was placed on bed rest. Plaintiff telephoned Kessler the night she was admitted to the hospital and began using short-term disability leave the next day, on September 16, 2004. Her short-term didsability leave was approved through approximately December 6, 2004.

Plaintiff continued to have complications with her pregnancy while she was on bed rest and disability leave. On October 24, 2004, Plaintiff was readmitted to the hospital and gave premature birth to her daughter. The baby died approximately one hour after she was born.

During this time period, Kessler was experiencing medical problems and also was away from work on short-term disability benefits. On his first day back to work, on November 1, 2004, Kessler telephoned Plaintiff to inquire about her condition and whether she intended to return to work. The parties sharply dispute what transpired during the remainder of this conversation.

According to Kessler, Plaintiff informed him during this conversation that she did not intend to return to work at U.S. Bank and was resigning. Kessler maintains that Plaintiff told him that she and her husband were moving to Tennessee to be closer to his family following the death of their daughter. Kessler contends that he asked Plaintiff to submit a letter of resignation as soon as

---

[3]      Kessler testified that he told Plaintiff that she "needed to get out of here, go to the doctor, hospital, whatever you need to do. . . ." (Kessler Dep., at 48.)

possible.

According to Plaintiff, she never said that she intended to resign her employment. She told Kessler that she wanted to transfer, at some indefinite point, to a U.S Bank branch in Tennessee. Plaintiff maintains, however, that she never told Kessler she was resigning, and intended to complete her maternity leave through the first week of December and return to the Columbus branch at that time.

Following the telephone call, Kessler prepared a memorandum to Plaintiff's file documenting the conversation in which he indicated that Plaintiff "stated that effective today that she would not be returning to work because they were moving to Tennessee at the end of the month." (Kessler Dep., at p. 45, Exh. 4.) Kessler contacted Stephen Phillips, in U.S. Bank's Human Resources department. Phillips instructed Kessler to process Plaintiff's resignation. In processing the resignation on the computer, Kessler selected "job abandonment" from among the available reasons for the termination. Resignation was not available as a classification for the termination on the computer program. Kessler now acknowledges that selecting "job abandonment" as the basis for the termination was an error. The impact of this selection was to terminate Plaintiff's short-term disability benefits, which should have continued through the end of her previously approved leave period. Neither Kessler nor anyone from U.S. Bank sent any confirmation or documentation regarding the termination of Plaintiff's employment to her.

Approximately one-week later, Plaintiff received a pay-stub in the amount of $0.00, indicating that her short-term disability had been terminated. She telephoned the company's Human Resources department and eventually spoke with Phillips. Phillips told Plaintiff that it was his understanding, based on conversations with Kessler, that she had quit. Plaintiff assured him that it

was not her intention to terminate her position with the bank. Plaintiff denied ever telling Kessler that she was moving to Tennessee. Phillips said that their records indicated that she had quit, the resignation had been processed, and he could not rescind her resignation. He indicated that the bank, at that time, would not re-hire her.

Shortly thereafter, on Friday, November 12, 2004, Plaintiff caused to be hand-delivered to Kessler a letter which stated that she desired to return to work after maternity leave when her doctor released her for work. Kessler forwarded the letter to Phillips, who in turn, sent it to the bank's general counsel.

After learning of Plaintiff's intentions not to resign, U.S. Bank recognized the discrepancy regarding Plaintiff's termination of employment. On November 18, 2004, Phillips attempted to contact Plaintiff directly to inform Plaintiff that she could return to work in her position at the same branch upon the completion of her maternity leave. Plaintiff did not respond to Phillips' attempts to contact her.

On the same day, November 18, 2004, Plaintiff's attorney sent a letter to Phillips outlining his position as to Plaintiff's potential claims against U.S. Bank and directed Phillips to have legal counsel contact him. On November 29, 2004, and in a voicemail message to Plaintiff's counsel left the previous week, general counsel for U.S. Bank extended the offer to reinstate Plaintiff when she returned from her leave of absence at the Columbus branch, or a comparable position at a different branch. Counsel for Plaintiff sent a letter dated that same day indicating that, in light of Phillips' statements that she would not be rehired, Plaintiff had decided to relocate to Tennessee and, therefore, could not take her previous position.

According to the November 29, 2004 correspondence from U.S. Bank's general counsel to

Plaintiff's attorney, the bank fully restored her short-term disability benefits, and requested an off-cycle check to be issued for payments due for the period of November 1, 2004 through November 15, 2004. She also was to receive her regular check on November 30, 2004. The parties do not dispute that Plaintiff received all of the benefits she was due for the entire period of her short-term disability leave, although the payments for November, 2004 were delayed for several weeks.

Plaintiff moved to Tennessee the first week of December, 2004. She currently resides in the State of Tennessee.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

## III.

### A.     Motion to Strike

Defendants move to strike the affidavits of Dr. Augustus Parker and Dr. Richard Mague that Plaintiff submitted in support of her Memorandum in Opposition to Defendants' Motion for Summary Judgment. Defendants contends that Plaintiff failed to timely produce the documents during discovery and filed them in direct contravention of the Court's scheduling order of January 3, 2007.

The Court's original scheduling order set in place a sequential order of disclosures requiring the Plaintiff to make her Rule 26(a)(2) disclosures by July 30, 2006. The sequence was clearly

-8-

designed to then require the Defendants to disclose their rebuttal experts by August 30, 2006. Each side would then have the opportunity to depose the other side's expert in advance of trial.

Plaintiff failed to retain experts who made their Rule 26(a)(2) disclosures by the July 30, 2006 deadline. Plaintiff explained that she could not afford to hire an accountant and that it had been logistically difficult to meet with her retained psychologist because of his schedule and her out-of-state residence. On January 3, 2007, the Court granted Plaintiff's request for an extension, expressly noting that "the expert testimony will not be put in issue by defendants' motion for summary judgment."[4] The deadlines for Plaintiffs' experts' disclosures was extended to June 13, 2007.

On January 30, 2007, Dr. Parker, Plaintiff's treating physician during her pregnancy in 2004, opined for the first time that Plaintiff's pre-term labor of September 15, 2004 was made worse when she was purportedly not released from work to go to the hospital emergency room, and that the delay in obtaining treatment that day had a negative impact upon the probability of a successful pregnancy.[5] Dr. Mague, Plaintiff's retained psychologist, opined that Plaintiff suffers from emotional distress. These expert opinions were not disclosed until long after the cutoff set forth in the scheduling order.

Federal Rule 26(a)(2)(B) requires parties to make mandatory disclosures about their experts.

---

[4] Plaintiff represented in her Motion for an Extension of Time that "[w]hether plaintiff is allowed to use her damage experts will not affect liability but it could affect damage issues." (Pl's Mot. for Extension, at p. 7.)

[5] There is some controversy as to whether and when Plaintiff served a copy of Dr. Parker's affidavit. Defendants contend that they were never served with a copy of the report and saw it for the first time when it was attached to Plaintiff's Memorandum in Opposition to their Motion for Summary Judgment on March 20, 2007. Plaintiff's counsel believes he sent the document as part of the responses to Defendants' third set of discovery requests. Defendants maintain that they never received the document.

The Rule clearly requires a party using a retained expert to furnish a written report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed. R. Civ. P. 26(a)(2)(B). Federal Rule of Civil Procedure 37(c)(1) requires compliance with Rule 26(a), "mandat[ing] that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)(citing *Salgado v. General Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998)(noting that "the sanction of exclusion is automatic and mandatory unless the sanction party can show that is violation of Rule 26(a) was either justified or harmless.")

Plaintiff has failed to demonstrate that her failure to disclose the reports was harmless. Although Defendants had Plaintiff's medical records, these are not a substitute for her treating physician's expert report. Nor does Plaintiff's disclosure of the names of Drs. Parker and Mague satisfy her Rule 26(a)(2) disclosure requirements. She also represented to the Court that her experts related only to issues of damage. Plaintiff has failed to provide a sufficient justification for her failure to her experts' opinions. Defendants' Motion to Strike is accordingly granted.

**B.     Pregnancy Discrimination Act**

Plaintiff has asserted a claim under the Pregnancy Discrimination Act provisions of Title VII, which prohibits sex-based discrimination on the basis of pregnancy. 42 U.S.C.A. § 2000e(k). Specifically, when the Pregnancy Discrimination Act was codified in 1978, Congress amended Title VII by clarifying that the terms "because of sex" or "on the basis of sex" include, but are not limited to, "because of or on the basis of pregnancy, childbirth, or related medical conditions." *Id.* Women affected by pregnancy, childbirth, or related medical conditions must be treated the same for all employment-related purposes. *Id.* Furthermore, women affected by such conditions are required

by Title VII to be treated the same for all employment-related purposes as other persons who are not affected, but who have a similar ability or inability to work. *Id.*

In the absence of direct evidence, the Court conducts the familiar *McDonnell Douglas* burden-shifting framework to analyze Plaintiff's Title VII-pregnancy discrimination claim. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). In order to show a prima facie case of pregnancy discrimination under Title VII, a plaintiff must show that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Cline*, 206 F.3d at 658. If the employee is able to present such a case, then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision. *Id.* If the employer proffers a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the employee, who, in order to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination. *Id.*; *see also Reeves*, 530 U.S. at 142-43 (holding that prima facie case and sufficient evidence of pretext may permit trier of fact to find unlawful discrimination, without additional, independent evidence of discrimination, though such showing will not always be adequate to sustain jury's finding of liability).

The parties do not dispute that Plaintiff was pregnant at the time of the events leading up to the Complaint in this action. Nor do the parties dispute that Plaintiff was qualified for the position she held at U.S. Bank.

Defendants contend, however, that Plaintiff cannot establish that she was subjected to an

-11-

adverse employment action. The Sixth Circuit has defined an "adverse employment action" as follows:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alternation of job responsibilities. A materially adverse change might be indicated by termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (citing *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993)); *see also Kocsis v. Multi-Care Mgmt.*, Inc., 97 F.3d 876, 885 (6th Cir. 1996).

Plaintiff asserts that she suffered an adverse employment action when she was terminated on November 1, 2004. Defendants concede that a genuine issue of material fact exists as to whether she voluntarily resigned her position during her telephone conversation with Kessler. They assert, however, that the legal consequence of Plaintiff's later refusal to return to work following her maternity leave, after the confusion regarding her initial resignation was resolved, vitiates any potential liability for mistakenly terminating her.

If Plaintiff did resign during her conversation with Kessler– a proposition with which Plaintiff disagrees and that the Court does not adopt as it views the facts in a light most favorable to her as the non-movant– her resignation cannot constitute an adverse employment action. *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003). Consequently, Plaintiff's pregnancy discrimination claim can survive summary judgment only she can demonstrate the existence of a genuine issue of material fact as to whether she suffered an adverse employment action. The Court concludes that such a genuine issue does not exist.

After Defendants recognized the discrepancy in recollection between Kessler and Plaintiff regarding the telephone conversation on November 1, 2004, Defendants informed Plaintiff that she could return to her work at the end of her leave. Defendants made an unconditional offer to reinstate Plaintiff to her former position, or another branch if she so chose, prior to the expiration of her maternity leave. The parties do not dispute that Plaintiff, with a delay of several weeks, otherwise received all of the short-term disability payments that she was due. Inasmuch as Plaintiff suffered no loss of wages, benefits, responsibilities, or anything else, her temporary termination resulted in no legally cognizable adverse effect on his employment.[6] *See Keeton v. Flying J, Inc.*, 429 F.3d 259 (6th Cir. 2005)(employee's termination was not a tangible employment action, as required for sexual harassment claim under Title VII, where termination was temporary and employee was reinstated); *Bowman v. Shawnee State University*, 220 F.3d 456, 459-60 (6th Cir. 2000)("Even if we assume that the loss of the . . . position constitutes a significant change in employment status, there is no tangible employment action in this case because the very temporary nature of the employment action in question makes it a non-materially adverse employment action."); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir.2001)(when an otherwise adverse employment action is rescinded before the employee suffers a tangible harm, the employee has not suffered an adverse employment action); *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp.2d 121, 138 (E.D. N.Y.2002)(plaintiff's assertion that he suffered an adverse employment action when employer discharged him failed as a matter of law because at the conclusion of defendants' investigation into plaintiff's allegations

---

[6]     Although Plaintiff does not argue it, the Court notes that the temporary cessation of her short-term disability benefits that led to a delay in the receipt of her benefits, caused by Kessler's clerical error in processing her termination, does not constitute adverse action. *Wilson-Simmons v. Lake County Sheriff's Dept.*, 982 F. Supp. 496, 502 (N.D. Ohio 1997).

-13-

concerning a previous incident, defendants offered an unconditional offer of reinstatement with full

back pay, the same salary and benefits, and the same seniority status); *Lempres v. CBS Inc.*, 916 F.

Supp. 15, 20 (D.D.C.1996)(employee who was offered her former position when she returned from

six-month maternity leave and was told that terms of contract including responsibilities, benefits,

title and salary would not be changed in any way on her unconditional return did not demonstrate

violation of FMLA).[7]

Plaintiff argues, however, that Defendants' offer for Plaintiff to return to work as scheduled

is legally insufficient because Defendants did not, in fact, reinstate her prior to extending the offer.

Plaintiff has failed to support her assertion that Defendants' failure to reinstate her, which, this

instance, would require no more than computer entries, legally impairs the unconditional offer to

return to work. The facts of this case reveal that Plaintiff spoke to Phillips some time during the

week of November 8, 2004, at which point she refuted his statement that she had voluntarily

resigned. Phillips initially indicated that he could not reinstate her to her job. On November 12,

2004, Plaintiff delivered to Defendants a letter requesting her job back upon the completion of her

maternity leave. Less than one-week later, on November 18, 2004, Phillips attempted to contact

Plaintiff to inform Plaintiff that she could return to work.[8] Plaintiff did not respond to Phillips'

attempt to contact her. Instead, on the same day, November 18, 2004, Plaintiff's attorney sent a

---

[7]    Defendants cite several cases in which the courts found that an employee's rejection of
an employer's unconditional offer of reinstatement ends the accrual of potential liability for backpay.
*See, e.g., Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 241 (1982); *Morvay v. Maghielse Tool & Die Co.*,
708 F.2d 229 (6th Cir. 1983). While these cases are not directly on point or binding, the Court finds this
authority persuasive in the fact-intensive context of this case for the proposition that U.S. Bank's offer
for Plaintiff to return to her job before she was scheduled to return from maternity leave was analogous
to an employer making an unconditional offer of reinstatement.

[8]    The record does not disclose how Phillips attempted to communicate this message to
Plaintiff. (Phillips Aff., ¶¶ 17-20).

position statement to Phillips setting forth potential legal claims, and directed Phillips to have legal counsel contact him. On November 29, 2004, and in a previous voicemail message to Plaintiff's counsel left the previous week, general counsel for U.S. Bank extended the offer to reinstate Plaintiff when she returned from her leave of absence at the Columbus branch, or a comparable position at a different branch. Within several hours, Plaintiff's attorney, as a representative for Plaintiff, rejected the offer because Mullins had already decided to move to Tennessee. The record establishes that Plaintiff voluntarily ended her employment and that she was not impacted by Defendants' failure to reinstate her prior to making the offer.

Plaintiff also suggests that Defendants' offer for Plaintiff to return to work was part of confidential settlement negotiations, and should not be considered by the Court. Plaintiff essentially argues that the offer should be excluded as an offer made "in the course of compromise negotiations" under Federal Evidence Rule 408. First, the proposition is not supported by the facts. The unambiguous offer, in writing, from U.S. Bank's general counsel came as a result of Plaintiff's counsel's demand that legal counsel contact him. The fact that he states in his correspondence that, if he is not contacted, "formal legal action will be necessary," does not convert the letter to a communication in the course of compromise negotiations. Second, Defendants' unconditional offer to reinstate Plaintiff is admissible and does not fall within the scope of Evidence Rule 408. In a discrimination case, where the employee has already been terminated and has threatened legal action, offers of settlement of the dispute, on condition of waiver and release of the claim, are inadmissible as evidence of discrimination under Fed.R.Evid. 408. *See Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir.1992). In this case, however, the open-ended offer contained no such condition, and in no way suggested that it was subject to Plaintiff abandoning her legal claims. Thus, the offer

-15-

cannot be considered an offer of settlement or compromise. *See Lightfoot v. Union Carbibe Corp.*, 110 F.3d 898, 909 (2d Cir. 1997); *Thomas v. Restor Health Related Facility*, 539 F. Supp. 630, 837 (D.C. N.Y. 1982)(employer's offer to unconditionally reinstate dismissed employee without prejudice to employee's claim was admissible in employment discrimination suit in view of fact that reinstatement offer was not made to compromise claim, which put such evidence outside scope of Evidence Rule 408).

Plaintiff also asserts that Defendants' refusal to allow her to leave work on September 15, 2004 constitutes an adverse employment action. The record is undisputed that Plaintiff began experiencing pain at home before she arrived at work, and had sick days available to her if she would have decided to take the time off. She telephoned the doctor, who told her to drink water for an hour. There is no dispute that Mullins never asked specifically to leave for the day, and Keller never expressly forbid her from doing so.

Plaintiff argues that she could not leave work because she was afraid she might lose her job. Plaintiff's perceived threat of discharge or any disciplinary action is insufficient to establish adverse employment action. "[T]he employee is obliged 'not to assume the worst, and not to jump to conclusions too fast.'" *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002)(quoting *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987)). An employee suffers no adverse employment action if his or her claim is the result of a speculative conclusion that termination would have been inevitable. *Agnew*, 286 F.3d at 310.

Finally, Plaintiff asserts that the difficulties in her pregnancy resulted from her delay in

leaving work, and that this medical condition was an adverse employment action.[9] She argues that "[p]hysical injuries and infliction of emotional distress alter terms and conditions of employment." (Pl's Mem. in Opp., at p. 7.) Plaintiff has cited to no legal authority to support her contention that, in the absence of an employee's actual request to leave work for medical reasons, an employer may be liable under Title VII or the Pregnancy Discrimination Act for subsequent adverse medical conditions.

The loss of a baby is a tragedy of the greatest magnitude. Plaintiff, however, has adduced no evidence that her employer denied a request to seek medical assistance. Because she cannot demonstrate adverse employment action, Plaintiff has failed to satisfy her burden of establishing a prima facie case of pregnancy discrimination. The Court therefore does not address Defendants' arguments regarding its legitimate, nondiscriminatory reasons for its actions or pretext. Defendants' Motion for Summary Judgment is therefore granted as to Plaintiff's claim under the Pregnancy Discrimination Act.

To be clear, this Court does not conclude that an employee who is pregnant has no legal recourse against an employer who refuses to allow the employee to seek medical care. The employee may have state law claims against the employer for such conduct. The Plaintiff has cited no case in which either Title VII or the Pregnancy Discrimination Act has been construed to include claims for personal injury or loss of a child. Even if relief were available under Title VII, however, the employer must have acted to prevent medical care to a pregnant employee. The Plaintiff in this case

---

[9]     The Court notes that the only evidence submitted by Plaintiff in support of her position that the delay in leaving work on September 15, 2004 contributed to the complications in her pregnancy is the dilatory report from her treating physician, Dr. Augustus Parker. As set forth above, however, the Court has granted Defendants' Motion to Strike.

has not made such a showing.

### C.    Race Discrimination Claims

Like her Pregnancy Discrimination Act claims, Plaintiff's cause of action under Title VII for race discrimination, proceeding on circumstantial evidence, is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). To demonstrate a prima facie case, the plaintiff must show that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *DiCarlo v. Potter,* 358 F.3d 408, 415 (6th Cir. 2004)

Plaintiff's race discrimination claim fails for the same reason that her pregnancy-based claims are subject to summary judgment. Specifically, Plaintiff cannot adduce sufficient evidence of adverse employment action. For these reasons, Defendants' Motion for Summary Judgment on Plaintiff's race-based claim under Title VII is granted.[10]

### D.    State Based Claim of Intentional Infliction of Emotional Distress

Because the Court disposes of all of Plaintiff's federal claims by this Order, the Court declines to exercise supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367(c)(3). Consequently, Plaintiff's state law claims are **DISMISSED** without prejudice. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726 (1966)("If the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Brandenburg v. Housing Auth. of*

---

[10]    Plaintiff's Memorandum in Opposition contains a section related to sexual harassment, hostile work environment. Neither Plaintiff's EEOC charge nor her Plaintiff's Second Amended Complaint contains any mention of a claim for sex-based harassment. The Court, therefore, declines to address it.

-18-

*Irvine*, 253 F.3d 891, 900 (6th Cir. 2001).

## IV.

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. #50) is

**GRANTED** with respect to Plaintiff's federal claims. The Court declines to exercise supplemental

jurisdiction over Plaintiff's state law claims. Defendants' Motion to Strike (Doc. #54) is also

**GRANTED**.


**IT IS SO ORDERED.**


_____7-17-2007_____
**DATED**

                                 _____
                                 **EDMUND A. SARGUS, JR.**
                                 **UNITED STATES DISTRICT JUDGE**